**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **BRUCE FOODS CORPORATION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-13-CV-231-KC** |
| | § | |
| **TEXAS GAS SERVICE, A DIVISION** | § | |
| **OF ONEOK, INC.,** | § | |
| | § | |
| **Defendant**. | § | |

**ORDER**

On this day, the Court considered Defendant's Motion to Dismiss Plaintiff's First Amended Original Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion"), ECF No. 15, in the above-captioned case (the "Case").[1] For the reasons described below, the Motion is **GRANTED** in part and **DENIED** in part.

**I.   BACKGROUND**

**A.   Procedural History**

Plaintiff filed its Original Petition, ECF No. 1-1, in the District Court of El Paso County, Texas, 210th Judicial District, on June 17, 2013. *See* Original Pet. 1. Defendant removed the Case to this Court on July 19, 2013. *See* ECF No. 1. Plaintiff, with the Court's leave, filed the Amended Complaint on October 2, 2013. *See* ECF No. 14. The Amended Complaint asserts claims of negligence, negligent misrepresentation, breach of warranty, breach of contract, and promissory estoppel against Defendant. Am. Compl. ¶¶ 26-48.

---

[1] Defendant initially filed a motion to dismiss the Case on July 29, 2013 (the "Initial Motion"). ECF No. 2. Before the Court ruled on the Initial Motion, Plaintiff, with the Court's leave, filed Plaintiff's First Amended Original Complaint (the "Amended Complaint"). ECF No. 14. The Court therefore denies the Initial Motion as moot.

Defendant filed the Motion on October 9, 2013, thereby requesting that the Court dismiss the Case in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Mot. 1-12. Plaintiff filed a response to the Motion (the "Response"), ECF No. 16, on October 22, 2013. The Response additionally requests leave to further amend the Amended Complaint should the Court deem the Amended Complaint insufficient under Rule 12(b)(6). Resp. ¶ 36. Defendant filed a reply (the "Reply"), ECF No. 17, on October 25, 2013.

On December 6, 2013, the Court requested that the parties further brief certain issues raised by the Motion. *See* ECF No. 18. Plaintiff filed its brief ("Plaintiff's Brief"), ECF No. 19, on December 23, 2013. Defendant in turn filed its brief ("Defendant's Brief"), ECF No. 20, on January 15, 2014.

### B.      Factual Background

The Court assumes the following facts to be true for the purposes of this Order:

Plaintiff owns and operates a manufacturing facility in El Paso, Texas (the "Facility") that processes peppers and other vegetables. Am. Compl. ¶ 7. Plaintiff requires a steady supply of natural gas to operate the boilers at the Facility. *Id*. Because harvesting and processing peppers is a time-sensitive operation, any interruption in Plaintiff's natural gas supply can severely harm Plaintiff's business. *See id*. ¶ 8.

In 2000, Plaintiff, along with Defendant's predecessor-in-interest, Southern Union Gas Company ("Southern"), entered into an agreement for the transportation[2] of natural gas (the

---

[2] The transportation of natural gas is distinct from the sale of gas. To reduce the incidence of anti-competitive behavior, the Federal Energy Regulatory Commission, by administrative order,

> required pipelines to separate, or "unbundle," their sales services from their transportation services at an upstream point near the production area and to provide all transportation services on a basis that is equal in quality for all gas supplies whether purchased from the pipeline or from any other gas supplier.

"Agreement"). ECF No. 2-1, at 2-11.[3] The Agreement provides that Southern would transport natural gas to Plaintiff to power the Facility. Am. Compl. ¶ 7; Agreement; Pl.'s Br. ¶¶ 8-9. Specifically, the Agreement provides that, if Plaintiff "deliver[s] or cause[s] to be delivered to" Southern a quantity of natural gas below a contractually-specified maximum, Southern will, subject to certain limitations, "receive, transport and redeliver" an equivalent quantity of natural gas to Plaintiff. Agreement ¶ 1.1. Although the Agreement explicitly provides that Plaintiff has no obligation to deliver any minimum level of gas for Southern to redeliver, *see id.* ¶ 1.3 ("It is expressly agreed and understood by the parties that nothing herein shall obligate [Plaintiff] to transport any minimum quantity of natural gas."), the Agreement also provides that, if Plaintiff delivers a volume "of gas to [Southern] so that the minimum amount owed by [Plaintiff] for transportation" is less than $7,525.00 per contract year, Southern "shall bill [Plaintiff] for the difference." *Id.* ¶ 4.2. The Agreement also contains a requirements clause (the "Requirements Clause") that prohibits Plaintiff from obtaining natural gas from other sellers/transporters. *See id.* ¶ 1.2; Pl.'s Br. ¶¶ 7, 9-11, 14; Def's Br. ¶ 8.

---

Nat. Gas. Transp. Info Service ¶ 411 (citing Order No. 636, *FERC Stats. and Regs., Regulations Preambles 1991-1996* ¶ 30,939 (1992)). *Accord* Nat. Gas. Transp. Info Service ¶ 492.

[3] As Plaintiff correctly notes, Defendant failed to attach a copy of the Agreement or its subsequent amendments to the Motion. *See* Resp. 12 n.2. The Court nonetheless considers the copy of the Agreement that Defendant attached to the Initial Motion because (1) the terms of the Agreement are essential to resolve the Motion; (2) Plaintiff does not dispute that the documents attached to the Initial Motion constitute true and accurate copies of the Agreement and its subsequent amendments; and (3) the Court may consider "[d]ocuments that a defendant attaches to a motion to dismiss" that are "referred to in the plaintiff's complaint and are central to [its] claim." *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). *See also Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011) (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)) ("[W]hen a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim."). Considering the document does not convert the Motion to a motion for summary judgment under Federal Rule of Civil Procedure 56. *See Crucci v. Seterus, Inc.*, No. EP–13–CV–317–KC, 2013 WL 6146040, at *4 (W.D. Tex. Nov. 21, 2013) (citations omitted).

The Agreement is subject to an interruptibility clause (the "Interruptibility Clause"), which provides as follows:

> Notwithstanding any other provision to the contrary, [Southern and its assigns] shall have the unconditional right, without giving notice, at any and all times during the term hereof, to immediately decrease, suspend or discontinue in whole or in part the receipt, transportation or delivery of gas quantities under this Agreement and [Southern and its assigns] shall not be liable, in any respect, to [Plaintiff] by reason of any exercise of said right. Notwithstanding the foregoing, [Southern and its assigns] shall, to the extent practicable, give [Plaintiff] at least two hours' notice before effecting any suspension or discontinuation of service.

Agreement ¶ 2.1.

Paragraph 1.1 of the Agreement further affirms that Southern would transport natural gas to Plaintiff "on an interruptible basis." *Id*. ¶ 1.1.

The Agreement incorporates by reference a document labeled Appendix A that contains several noteworthy provisions. *See id*. ¶ 8.4; App. A, ECF No. 2-1, at 12-19. Paragraph 10.1 of Appendix A permits assignment of the Agreement. *See* App. A ¶ 10.1. Additionally, Paragraph 11.2 of Appendix A permits amendment of the Agreement, but "only by a written instrument executed by the parties hereto and expressly stating that it is an amendment to this Agreement." *See id*. ¶ 11.2. Appendix A also contains a force majeure clause that, *inter alia*, excuses performance of any party unable to perform the Agreement due to the "breakage or freezing of pipelines," "the making of repairs or alterations to lines of pipe or plants," the "partial or entire failure of gas supply," or other circumstances "not reasonably within the control of the party claiming 'force majeure.'" *See id*. ¶ 8.1.

The initial duration of the Agreement was between January 1, 2001, and December 31, 2005. *See* Agreement ¶ 5.1. Plaintiff and Southern formally amended the Agreement in 2001 to extend the duration of the Agreement to January 31, 2006, but this amendment made no relevant substantive changes to the terms of the Agreement described above. *See* ECF No. 2-1, at 20-21.

4

Upon the expiration of this term, the Agreement provides that it "shall extend on a year-to-year basis unless written notice of termination is delivered no less than one hundred eighty (180) days prior to the end of the primary term or any extension thereof by either" Plaintiff or Southern. *Id.*; Agreement ¶ 5.1.

Sometime between 2001 and 2005, Southern assigned the Agreement to Defendant. *See* Am. Compl. ¶ 7; ECF No. 2-1, at 22 (listing Defendant as the transporter under an amendment to the Agreement); App. A ¶ 10.1 (permitting assignment of the Agreement). In 2005, Plaintiff and Defendant formally amended the Agreement once more. *See* ECF No. 2-1, at 22-29. As relevant to this order, the 2005 amendment clarified the Interruptibility Clause in a manner described in a subsequent section of this order. *See id.* at 28. By 2006, the initial term of the Agreement had expired, and Plaintiff and Defendant thereafter extended the Agreement on a year-to-year basis pursuant to the Agreement's extension provision. *See id.* at 20.

In July 2011, Defendant informed Plaintiff that it intended to perform testing on one or more of the pipelines that supplied natural gas to the Facility. Am. Compl. ¶ 9. Plaintiff responded that such testing would disrupt Plaintiff's operations during its peak production season and thereby cause Plaintiff substantial financial losses. *Id.* Plaintiff therefore requested that Defendant delay its testing until after the peak season. *Id.* Defendant assured Plaintiff that it would install a bypass pipeline that would provide the Facility an uninterrupted supply of natural gas while Defendant performed the testing. *Id.* ¶ 10. In reliance on Defendant's assurance that the Facility would continue to receive natural gas service, Plaintiff hired migrant and transient labor to work at the Facility, and began processing its products. *Id.* ¶¶ 8, 10, 25.

Defendant installed the bypass pipeline in August 2011. *Id*. ¶ 11. Defendant then shut off Plaintiff's gas supply from Defendant's main pipeline and began supplying the Facility from the bypass pipeline alone. *Id*. ¶ 12.

Shortly thereafter, Plaintiff began experiencing increasingly severe boiler shutdowns, which eventually forced Plaintiff to completely cease operations at the Facility. *Id*. ¶¶ 12-16, 20. This caused Plaintiff substantial financial loss. *Id*. ¶¶ 15, 25.  After some initial unfruitful investigations, Plaintiff determined that Defendant's bypass pipeline was supplying an insufficient level of gas to the boilers at the Facility, thereby causing the boilers to shut down. *Id*. ¶¶ 14-16, 20.

Plaintiff promptly informed Defendant of the problem. *Id*. ¶¶ 14-15. Defendant took numerous steps to attempt to remedy the gas supply problem, but these steps all failed. *See id*. ¶¶ 17-18. Defendant then ran a new bypass line from a metering station owned by El Paso Natural Gas Company to the Facility, which finally corrected the problem. *Id*. ¶ 18. "In short, once the Facility's gas supply stopped coming from [Defendant's] pipeline, the boiler problems stopped." *Id*.

In sum, Plaintiff claims that Defendant's failure to properly construct and maintain the bypass pipeline caused the Facility to temporarily shut down, which in turn caused Plaintiff sizable economic damages. *Id*. ¶¶ 20-21, 25. Plaintiff alleges that it had to dispose of products on the assembly line that it had already begun processing. *Id*. ¶¶ 10, 25. Plaintiff further alleges that "during shut-down periods, [Plaintiff's] large production workforce was forced to stand idle, with [Plaintiff] paying workers without getting any product produced." *Id*. ¶ 25. Plaintiff also alleges that "[t]he shut-down forced [Plaintiff] to cancel pending orders with growers, exposing

[Plaintiff] to claims from growers and also at minimum disturbing its relationship with growers." *Id*.

## II.    DISCUSSION

### A.    Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). When ruling on a Rule 12(b)(6) motion, the Court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Though a complaint need not contain "detailed" factual allegations, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *accord Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted); *Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 506 (5th Cir. 2011). Ultimately, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted). Nevertheless, a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. at 556 (quoting

7

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Generally, "[i]n considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins*, 224 F.3d at 498 (citing Fed. R. Civ. P. 12(b)(6)). However, the Fifth Circuit has "note[d] approvingly" that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." *Id*. at 498-99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

When a court dismisses one or more of a plaintiff's claims pursuant to Rule 12(b)(6), the court should generally give the plaintiff an opportunity to amend its complaint to cure the defect unless amendment would be futile. *See Adams v. Energizer Holdings, Inc.*, Civil Action No. 3:12CV797TSL–JMR, 2013 WL 1791373, at *4 (S.D. Miss. Apr. 19, 2013) (citing *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000)).

### B.      Analysis

The Amended Complaint asserts claims of negligence, negligent misrepresentation, breach of warranty, breach of contract, and promissory estoppel against Defendant. Am. Compl. ¶¶ 26-48. Defendant requests that the Court dismiss each of these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court assesses the factual sufficiency of each of Plaintiff's claims under Texas law. *See Aerosonic Corp. v. Trodyne Corp.*, 402 F.2d 223, 229 (5th Cir. 1968).

### 1.      Negligence and negligent undertaking

Plaintiff alleges that Defendant breached its "duty of reasonable care in performing the services under the Agreement." Am. Compl. ¶ 27. Plaintiff further alleges that Defendant failed

to exercise ordinary care when it "undertook actions that went beyond the terms of the Agreement, such as the installation of a gas bypass line and the repairs, as well as the failed attempts to correct" the boiler problems. *Id.*

Defendant argues that it cannot be held liable for negligence because, under the Interruptibility Clause, Defendant had no duty to provide any natural gas to the Facility at all. Mot. ¶¶ 5-6. Defendant further argues that because Plaintiff's negligence claim is predicated solely upon Defendant's alleged failure to perform its duties under the Agreement, Plaintiff's claim sounds only in contract and not in tort. *Id.* ¶¶ 7-9.

To establish negligence under Texas law, a plaintiff must demonstrate that the defendant breached a legal duty it owed to the plaintiff, and thereby proximately caused the plaintiff injury. *See Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). A defendant proximately causes a plaintiff's injury when (1) the breach is the cause in fact of that injury and (2) the injury was foreseeable. *See Doe v. Messina*, 349 S.W.3d 797, 800 (Tex. App. 2011) ("*Messina*") (citing *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) ("*Boys Clubs*")).

Under Texas law, a negligence claim cannot be predicated upon a breach of a contract. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-95 (Tex. 1991) ("*DeLanney*"). "[I]f the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *Id.* at 494. Likewise, "[w]hen the only loss or damage" alleged by the plaintiff "is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *Id.* (citing W. Keeton *et al.*, Prosser and Keeton on the Law of Torts 656 (5th ed. 1984); 1 J. Edgar, Jr. & J. Sales, Texas Torts and Remedies § 1.03[4][b] at 1-36 (1990)).

9

By contrast, "[i]f the defendant's conduct . . . would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort." *Id*. To illustrate, where a repairperson and a homeowner contract to repair the homeowner's water heater, and the repairperson performs shoddy repairs that cause the water heater to ignite and destroy the house, the homeowner has at least two separate causes of action against the repairperson: a contract claim based on the repairperson's failure to fix the heater as agreed, and a tort claim based on the destruction of the home. *See id*. (analyzing *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947)). *Accord Century Sur. Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 269-70 (5th Cir. 2009). The crucial distinction is that whereas

> misfeasance or negligent affirmative conduct in the performance of the promise generally subjects an actor to tort liability as well as contract liability . . . there is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made.

*DeLanney*, 809 S.W.2d at 495 (Tex. 1991) (citing Prosser and Keeton at 656-57). Accordingly, Plaintiff's negligence claim may only survive a motion to dismiss if the Amended Complaint alleges misfeasance or negligent affirmative conduct beyond Defendant's alleged failure to satisfy the terms of the Agreement.[4]

Thus, when determining whether the existence of a contract between the parties bars a tort claim under *DeLanney*, the court considers both (1) "the source of defendant's duty to act (whether it arose solely out of the contract or from some common-law duty)" and (2) "the nature of the remedy sought by the plaintiff." *Formosa Plastics Corp. USA v. Presidio Eng'rs and*

---

[4] Although "[s]ome contracts involve special relationships that may give rise to duties enforceable as torts," no such special relationship is present here. *See Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663 (Tex. App. 1996) (citations omitted).

*Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 12 (Tex. 1996)). The court looks "to the substance of the cause of action and not necessarily the manner in which it was pleaded." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617-18 (Tex. 1986) (citing *Int'l Printing Pressmen & Assistant Union v. Smith*, 198 S.W.2d 729 (Tex. 1946)). As such, "the process of characteriz[ing]" a claim as a contract claim or a tort claim under Texas law "resists rigid categories in favor of an analysis that accounts for all of a claim's particular contours." *Century Sur. Co.*, 578 F.3d at 268 (citations omitted).

### a.   The Court dismisses Plaintiff's negligence claim to the extent it alleges that Defendant failed to comply with the Agreement

To the extent that Plaintiff's negligence claim is predicated upon its argument that "[Defendant] owed [Plaintiff] a duty of reasonable care in performing the services under the Agreement," Am. Compl. ¶ 27, the Court dismisses the claim. This is, at bottom, a claim that Defendant failed to live up to its obligations under the Agreement. The claim therefore sounds in breach of contract rather than negligence. *See El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 142-43 (Tex. 2012); *DeLanney*, 809 S.W.2d at 494.

Although Plaintiff has requested leave to further amend its pleadings in the event that the Court dismisses any or all of its claims, *see* Resp. ¶ 36, the Court does not grant Plaintiff leave to supplement this particular claim because doing so would necessarily be futile.[5] *See Adams*, 2013 WL 1791373, at *4 (citing *Hart*, 199 F.3d at 248 n.6). Plaintiff, as a matter of law, cannot bring a breach of contract claim under the guise of a negligence claim.

---

[5] However, Plaintiff may seek leave to further amend the Amended Complaint in other respects.

  **b.**  **The Court denies the Motion as to Plaintiff's negligent undertaking claim**

Plaintiff's negligence claim further alleges that Defendant "undertook actions that went beyond the terms of the Agreement, such as the installation of a gas bypass line and the repairs, as well as the failed attempts to correct the [boiler] problem." Am. Compl. ¶ 27. The Court therefore assesses whether this allegation sufficiently raises a claim that Defendant voluntarily undertook a responsibility independent of the Agreement such that Defendant could incur negligence liability for failing to perform that undertaking with due care.

 "While Texas law imposes no general duty to 'become [a] good Samaritan,'" *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) (citations omitted), an entity that "undertakes, gratuitously or for consideration, to render services to another" to protect another entity's "person or things" owes "a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119-20 (Tex. 1976) (citing *Fox v. Dallas Hotel Co.*, 240 S.W. 517 (Tex. 1922); Restatement (Second) of Torts § 323 (1965)). This duty is triggered once the entity commits "an affirmative act upon which reliance can be based." *See Helbing v. Hunt*, 402 S.W.3d 699, 703-04 (Tex. App. 2012) (citing *Entergy Gulf States, Inc. v. Akrotex, Inc.*, 40 S.W. 3d 201, 206 (Tex. App. 2001)). The entity that undertakes such services may be found liable for negligence if it fails to exercise reasonable care in its undertaking, and if (1) that failure increases the risk of harm to the other entity or (2) the other entity relied on the undertaking entity's performance. *See Torrington Co.*, 46 S.W.3d at 838 (citing Restatement (Second) of Torts § 323 (1965)). "[A] plaintiff asserting a claim for negligent undertaking . . . must also prove that the defendant's breach proximately caused the plaintiff's injuries," which in turn requires that the plaintiff prove "cause in fact and

foreseeability." *Messina*, 349 S.W.3d at 800 (citing *Torrington Co.*, 46 S.W.3d at 838; *Boys Clubs*, 907 S.W.2d at 477). Finally, a plaintiff may only succeed on its negligent undertaking claim in "situations where bodily injury or [physical] injury to property belonging to the party is involved." *Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 03–09–00566–CV, 2011 WL 2769838, at *7 n.4 (Tex. App. July 12, 2011) (quoting *Wal-Mart Stores, Inc. v. Lane*, 31 S.W.3d 282, 293 (Tex. App. 2000) ("*Lane*"); citing *Sibley v. Kaiser Found. Health Plan of Tex.*, 998 S.W.2d 399, 403 (Tex. App. 1999)). *Accord Vodicka v. Lahr*, No. 03–10–00126–CV, 2012 WL 2075713, at *6 (Tex. App. June 6, 2012) (citing *Torrington Co.*, 46 S.W.3d at 837; Restatement (Second) of Torts § 323 (1965)).

Here, Plaintiff alleges that Defendant voluntarily delivered natural gas to the Facility instead of interrupting Plaintiff's service while performing testing on the main gas supply line. Am. Compl. ¶¶ 9-10. Defendant installed the bypass line for Plaintiff's benefit so that Plaintiff could continue to operate during its peak season. *Id*. ¶¶ 9-11. After Plaintiff began experiencing boiler problems, Defendant undertook further attempts to correct the insufficient gas flow. *Id*. ¶ 17.

The parties dispute whether these alleged actions constituted an undertaking independent of Defendant's obligations under the Agreement. *Compare* Pl.'s Br. ¶¶ 15-16 *with* Def.'s Br. ¶¶ 19-20. Indeed, Plaintiff itself advances inconsistent arguments on this score. *Compare* Am. Compl. ¶ 27 (describing "the installation of the gas bypass line and the repairs, as well as the failed attempts to correct the problem" as "beyond the terms of the Agreement") *with* Pl.'s Br. ¶¶ 15-16 (arguing that the Agreement contains an "implicit requirement" to "construct a bypass pipeline" and "perform repairs at the Facility").

Neither the Agreement nor Appendix A contains any provision explicitly requiring Defendant to perform repairs at the Facility or to construct a bypass pipeline. *See* Agreement; App. A. Although the Agreement concerns the transportation of natural gas, the Agreement and Appendix A are both silent as to Defendant's specific responsibilities in the event that it needs to perform testing on a pipeline or when mechanical difficulties impede the flow of natural gas. *See* Agreement; App. A. For that reason, the Court concludes that Defendant's alleged actions were indeed not contemplated by the Agreement. *See Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 540-41 (5th Cir. 1982).

Plaintiff argues that, although the Agreement contains no explicit requirement that Defendant perform repairs and construct a bypass pipeline, the fact that Defendant did in fact perform repairs and construct the pipeline is proof that the Agreement implicitly required those actions. *See* Pl.'s Br. ¶¶ 15-17 ("If Defendant really believed at the time that the Agreement means what Defendant now claims, Defendant would not have undertaken its effort to put in a bypass pipeline, or to take remedial measures after the bypass pipeline did not work. The Defendant's own post-Agreement conduct in that regard demonstrates the intent of the parties under the Agreement, and these implied contractual provisions."). However, because the Agreement unambiguously contains no such requirement, the parties' post-contract conduct is not probative of the Agreement's true meaning. *See Hewlett-Packard Co. v. Benchmark Elec., Inc.*, 142 S.W.3d 554, 563 n.4 (Tex. App. 2004). Moreover, contractual obligation is not the only plausible reason why Defendant might want to perform repairs or construct a bypass pipeline to continue to service the Facility during testing; Defendant could have been motivated by a desire to maintain customer relations or to continue to generate revenues during the testing period. *See*

14

Def.'s Br. ¶ 20. Thus, the Court concludes that the Defendant's alleged actions constituted an undertaking beyond the terms of the Agreement.

Plaintiff argues that it is necessary to impute such responsibilities into the Agreement to make the Agreement coherent and/or effectuate the parties' intent. *See* Pl.'s Br. ¶¶ 18-20. However, the Agreement may be interpreted in a sensible and coherent manner without imposing on Defendant an obligation to construct a bypass pipeline or perform repairs.

Defendant argues that even though the alleged actions were "not *required by* the Agreement, both activities were certainly *within the scope* of the Agreement," such that the existence of a contract between the parties precludes Plaintiff from recovering in tort under the *DeLanney* rule described above. *See* Def.'s Br. ¶ 19 (emphasis in original). Specifically, Defendant argues that because the alleged actions relate to the overall subject matter of the Agreement – namely, the transportation of natural gas – Plaintiff cannot sustain a negligent undertaking claim predicated on those actions. *See id*. ¶ 26. However, the cases Defendant cites in support of its argument do not stand for the proposition that the *DeLanney* rule precludes tort claims that implicate the same subject matter addressed by a contract between the parties, rather than only tort claims that would merely seek to enforce the terms of the contract. *See id*. ¶¶ 23-27.

Defendant first cites *El Paso Marketing, L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138 (Tex. 2012), in support of its position. In that case, the Supreme Court of Texas, following *DeLanney*, ruled that a power plant operator could not sue a pipeline transportation service provider under a negligence theory for violating the terms of a natural gas transportation agreement. *See id*. at 142-144 (citing *DeLanney*, 809 S.W.2d at 494). Unlike this case, however, the plaintiff in *El Paso Marketing* alleged only that the defendant negligently failed to perform

15

its obligations under the express terms of the transportation agreement. *See id*. at 139-144. Thus, *El Paso Marketing* does not address one way or the other the issue of whether the *DeLanney* rule bars a negligent undertaking claim predicated on conduct that goes beyond the express terms of a contract between the parties. The case is therefore inapposite to the question at hand.

Defendants then cite the following statement in *Memorial Hermann Healthcare System Inc. v. Eurocopter Deutschland, GMBH*, Civil Action No. G-06-438, 2007 WL 2446786 (S.D. Tex. Aug. 23, 2007), *aff'd*, 524 F.3d 676 (5th Cir. 2008): "Whether Plaintiffs can prove the elements of a negligent undertaking claim is irrelevant, since all negligence claims are barred by the economic loss doctrine." 2007 WL 2446786, at *2. *See also Small Ventures USA, L.P. v. Rizvi Traverse Mgmt., LLC*, Civil Action No. H–11–3072, 2013 WL 4773965, at *2 n.3 (S.D. Tex. Sept. 4, 2013) (quoting, in dicta, this statement in *Memorial Hermann*). Defendant therefore contends that "once a court determines that the economic loss doctrine [articulated in *DeLanney*] applies, the court need not analyze different types of negligence claims because the doctrine bars all types of negligence claims." Def.'s Br. ¶ 24.

Defendant's statement of law on this score is incorrect. *Memorial Hermann*, considered in context and in light of Texas precedent, does not hold that the existence of a contract between two parties categorically precludes one of the parties from bringing a negligence suit against the other. *Memorial Hermann* instead holds that, "when an allegedly defective product harms nothing but itself," the purchaser of that product may not sue the manufacturer on a negligent undertaking theory; the purchaser may only pursue a negligence claim where the "damages are accompanied by physical harm to persons or property other than the allegedly defective product." 2007 WL 2446786, at *1, *3. *Accord Century Sur. Co.*, 578 F.3d at 269-70; *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 417-18 (Tex. 2011). As the Court explains

16

below, Plaintiff has sufficiently alleged physical damages to an interest other than the natural gas

itself and its redelivery to the Facility. Therefore, the rule articulated in *Memorial Hermann* does

not preclude Plaintiff's negligent undertaking claim.

Indeed, Defendant concedes that the *DeLanney* rule is not as broad as the above-quoted

sentence in *Memorial Hermann* would indicate in isolation. *See* Def.'s Br. ¶ 25 ("[Defendant]

would not dispute, however, that a negligent undertaking claim can occur between two parties

when the complained of conduct falls completely outside of the scope of the agreement."). As

noted above, *DeLanney* contemplates that

> [i]f the defendant's conduct – such as negligently burning down a house – would
> give rise to liability independent of the fact that a contract exists between the
> parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's
> conduct – such as failing to publish an advertisement – would give rise to liability
> only because it breaches the parties' agreement, the plaintiff's claim ordinarily
> sounds only in contract.

809 S.W.2d at 494.

That is, *DeLanney* contemplates that a plaintiff may permissibly bring both tort and contract

claims against a contracting party where the plaintiff alleges a loss beyond the terms of the

contract alone. *See* 809 S.W.2d at 494-95. *Accord Jim Walter Homes, Inc.*, 711 S.W.2d at 618

("The acts of a party may breach duties in tort or contract alone or simultaneously in both.").

Thus, *Memorial Hermann* and *Small Ventures USA* do not categorically prohibit Plaintiff from

bringing a negligent undertaking claim for Defendant's alleged negligence in performing repairs

and constructing the bypass pipeline.[6]

---

[6] The Court additionally notes that the Fifth Circuit, in affirming the district court's decision in *Memorial Hermann*,
did so in much less sweeping terms. *See Mem'l Hermann Healthcare Sys., Inc. v. Eurocopter Deutschland, GMBH*,
524 F.3d 676, 677-79 (5th Cir. 2008).

*Jones v. Pesak Brothers Construction, Inc.*, No. 01-12-00535-CV, 2013 WL 4824453 (Tex. App. Sept. 10, 2013) ("*Pesak Bros.*"), the final case cited by Defendant in support of its argument, does not support the proposition that the *DeLanney* rule bars tort claims based on actions that fall outside the terms of a contract but implicate the same subject matter as the contract. In fact, *Pesak Brothers* arguably undermines Defendant's argument. In *Pesak Brothers*, the parties had entered a contract for the construction of a home. *See id.* at *1. The house was defective in numerous respects. *See id.* at *3. The plaintiffs "sought to hold [the defendant] liable for negligence under a voluntary undertaking theory, because they had taken [the defendant's] suggestion to build the home on a site downhill from the location they originally considered," which caused damage to the home. *Id.* at *11. The court held that the *DeLanney* rule barred the plaintiffs' negligent undertaking claim because the plaintiffs did not "point to an injury separate from the claims arising from the construction of the home." *Id.* That is, the plaintiffs' negligent undertaking claim was barred because it was predicated on damage to the exact subject of the contract between the parties: namely, the house. In that respect, *Pesak Brothers* stands for the same proposition as *Memorial Hermann*, as discussed above. *Pesak Brothers* at no point intimates that if, in the act of building the house, defendant had damaged some interest of plaintiffs other than the house itself, the *DeLanney* rule would bar a tort claim on the grounds that the claim arose necessarily from the defendant's construction activities. To the contrary, the court suggested that if, counterfactually, plaintiffs had "*shown a separate undertaking from the construction contract itself*, or any *increased risk of harm separate from the performance under the contract*," the plaintiffs' negligent undertaking claim might have succeeded. *See id.* at *11 (emphasis added). This language suggests that where, as is alleged here, a defendant voluntarily performs an undertaking beyond the terms of the contract between it and the plaintiff, and in

18

performing that undertaking the defendant negligently harms some interest of plaintiff other than the exact interest granted by the contract, the claim is not barred by the *DeLanney* rule.

Thus, Defendant has identified no case that stands for the proposition that the *DeLanney* rule bars negligent undertaking claims based on actions that fall outside the terms of a contract but implicate the same subject matter as the contract. *See* Def.'s Br. ¶¶ 23-27. Nor has the Court identified one in its own research.

Most importantly, the Court concludes that such a rule would conflict with the Supreme Court of Texas's own reasoning in *DeLanney*. As explained above, the *DeLanney* court favorably cited its prior decision in *Scharrenbeck*, 204 S.W.2d 508, in which the court held that a homeowner could properly bring both a negligence action for the destruction of his home and a breach of contract action for failing to repair his heater. *DeLanney*, 809 S.W.2d at 494. If a plaintiff could not bring a negligence claim that arises from the same activities implicated by a contract with the defendant, the *Scharrenbeck* court would not have reached this result, because the tort claim in *Scharrenbeck* arose from the same subject matter as the contract – namely, the repair of the water heater. *Accord Century Sur. Co.*, 578 F.3d at 270 (holding that, under Texas law, a tort claim would not be barred by the *DeLanney* rule described above if the plaintiff had counterfactually "alleged that the faulty pool construction damaged its business interests or adjacent property"). *See also Sharyland Water Supply Corp.*, 354 S.W.3d at 418 ("[W]e have applied the economic loss rule [articulated in *DeLanney*] only in cases involving defective products or failure to perform a contract.").

Thus, the mere fact that Plaintiff's negligent undertaking claim arises from the same subject matter as the Agreement – namely, the transportation of natural gas – does not necessarily require the Court to dismiss the claim. Defendant's contractual duty to transport

19

natural gas did not, under the explicit terms of the Agreement, require it to construct a bypass pipeline or perform repairs at the Facility. Because Plaintiff alleges that Defendant breached a duty independent of its obligations under the Agreement and caused Plaintiff some injury unrelated to the natural gas itself, the Court analyzes whether those allegations state a plausible claim for relief.

Because Defendant allegedly took voluntary actions independent of its obligations under the Agreement, Defendant had the duty to discharge its undertakings with reasonable care. *See*, *e.g.*, *De Sanchez v. Sporran EE, Inc.*, No. 13-08-00541-CV, 2010 WL 3420572, at *5 (Tex. App. Aug. 31, 2010); *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 598 (Tex. App. 2008). Plaintiff has sufficiently alleged that Defendant failed to exercise reasonable care in its voluntary undertaking. The bypass line operated so poorly that Plaintiff had to shut down the Facility entirely. Am. Compl. ¶¶ 12-16. Defendant's attempts to remedy the problem all failed. *Id.* ¶ 17. This is sufficient to establish breach. *See*, *e.g.*, *Wilson v. Tex. Parks & Wildlife Dep't*, 8 S.W.3d 634, 635-36 (Tex. 1999) (holding that jury question as to breach existed where defendant voluntarily undertook duty to warn park visitors of flooding and where flood early warning system did not sound due to mechanical difficulties); *Tex. Woman's Univ. v. Methodist Hosp.*, 221 S.W.3d 267, 284-85 (Tex. App. 2006).

Because the problems did not begin until Defendant switched Plaintiff's supply to the bypass line, and because the problems resolved themselves once Defendant began supplying the Facility with natural gas from another provider, Plaintiff has also sufficiently alleged that Defendant's failure to exercise reasonable care proximately caused Plaintiff's injury. *See Messina*, 349 S.W.3d at 800 (citing *Torrington Co.*, 46 S.W.3d at 838); *Boys Clubs*, 907 S.W.2d at 477) (holding that causation is an element of a negligent undertaking claim). It was

foreseeable to Defendant that its failure to perform its undertaking with due care could cause

Plaintiff harm. *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005) (holding that

foreseeability is an element of proximate cause).

Finally, the Court analyzes whether Plaintiff has alleged the type of injury that is

compensable under a negligent undertaking claim. To reiterate, a plaintiff may only succeed on

its negligent undertaking claim in "situations where bodily injury or [physical] injury to property

belonging to the party is involved." *Fernea*, 2011 WL 2769838, at *7 n.4 (quoting *Lane*, 31

S.W.3d at 293; citing *Sibley*, 998 S.W.2d at 403). *Accord Vodicka*, 2012 WL 2075713, at *6

(citing *Torrington Co.*, 46 S.W.3d at 837; Restatement (Second) of Torts § 323 (1965)). As such,

plaintiff cannot recover for economic damages, such as lost profits, caused by Defendant's

alleged negligence. *See id.* (citing *Torrington Co.*, 46 S.W.3d at 837; Restatement (Second) of

Torts § 323 (1965)). Nevertheless, Plaintiff has sufficiently alleged at least some physical

damage to its property – namely, its inventory of unprocessed chiles and other products that

Plaintiff had to discard due to Defendant's alleged failure to perform the repairs and construct

the bypass pipeline with due care. *See* Am. Compl. ¶ 25. Thus, although Plaintiff's ultimate

recovery on this claim will be limited to the physical damage to its property, Plaintiff has

sufficiently alleged a negligent undertaking claim that survives a Rule 12(b)(6) motion to

dismiss. *See Twombly*, 550 U.S. at 555. The Court accordingly denies the Motion to that extent.

### 2. Negligent Misrepresentation

Plaintiff alleges that Defendant falsely represented,

by affirmation or omission, that there would be no interruption in the gas supply
or pressure during the testing to be conducted, that the alternative gas line would
supply adequate gas levels during [Plaintiff's] peak production season, that the
testing and alternative line would cause no problems, damages, loses [sic] or

21

disruption to [Plaintiff], and that [Plaintiff] needed to take no other action to protect itself from any possible disruption in service.

Am. Compl. ¶ 30.

Plaintiff further alleges that it relied on these representations to its detriment. *Id*. Thus, argues Plaintiff, Defendant is liable for negligent misrepresentation. *Id*. ¶¶ 29-31.

Defendant responds that the *DeLanney* rule described above bars Plaintiff's negligent misrepresentation claim, because Plaintiff cannot recast its breach of contract claim as a tort claim. *See* Mot. ¶¶ 10-11; Reply ¶¶ 8-10. Defendant further argues that Plaintiff cannot prove that it sustained pecuniary loss in reliance on any of Defendant's representations. *See* Mot. ¶ 12.

To establish negligent misrepresentation under Texas law, a plaintiff

> must prove that (1) a representation [wa]s made by a defendant in the course of [its] business or in a transaction in which [it] has a pecuniary interest; (2) the defendant provide[d] "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffer[ed] pecuniary loss by justifiably relying on the representation.

*Hagans v. Woodruff*, 830 S.W.2d 732, 735-36 (Tex. App. 1992) (citing Restatement (Second) of Torts § 552 (1977); *AmSav Grp. v. Am. Sav. & Loan Ass'n of Brazoria Cnty.*, 796 S.W.2d 482, 488 (Tex. App. 1990)). *Accord Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 438 (Tex. App. 2004); *Airborne Freight Corp. v. C.R. Lee Enters.*, 847 S.W.2d 289, 291, 294 (Tex. App. 1992) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

"[T]he 'false information' contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct . . . A promise to act or not to act in the future cannot form the basis of a negligent misrepresentation claim." *Roof Sys., Inc.*, 130 S.W.3d at 439 (citing *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App. 1999)). *Accord Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 651 (Tex. App. 2003); *Airborne Freight Corp.*, 847 S.W.2d at 294. "[N]egligent misrepresentation is a cause of action recognized in lieu of a breach of contract claim, not usually available where a contract was actually in force between the parties." *Beal Bank, S.S.B.*, 124 S.W.3d at 651 (quoting *Airborne Freight Corp.*, 847 S.W.2d at 295).

The Court concludes that Plaintiff's negligent misrepresentation claim fails because the alleged representations all involve promises of future events: namely, that Defendant would continue to supply natural gas to the Facility without disruption. *See* Am. Compl. ¶ 30; *Roof Sys., Inc.*, 130 S.W.3d at 439 (citing *Allied Vista, Inc.*, 987 S.W.2d at 141); *Beal Bank, S.S.B.*, 124 S.W.3d at 651; *Airborne Freight Corp.*, 847 S.W.2d at 294. The Court therefore dismisses Plaintiff's negligent misrepresentation claim in its entirety.

However, Plaintiff has requested leave to further amend the Amended Complaint in the event that this Court dismisses all or some of its claims. *See* Resp. ¶ 36. Plaintiff could conceivably allege additional factual matter indicating that Defendant made some other representations to Plaintiff based on then-existing facts. Plaintiff may therefore move for leave to amend its pleadings to rehabilitate its negligent undertaking claim.[7] *See Adams*, 2013 WL 1791373, at *4 (citing *Hart*, 199 F.3d at 248 n.6). However, because Plaintiff's deadline to file motions to amend the pleadings has already passed, *see* ECF No. 11, at 1, Plaintiff may not amend its pleadings as a matter of course, but must instead seek leave to further amend the Amended Complaint by a motion demonstrating good cause. *See* Federal Rule of Civil Procedure 16(b)(4).

---

[7] The Court here expresses no opinion as to whether the allegations in the Amended Complaint as it currently stands would be sufficient to satisfy the other elements of a negligent misrepresentation claim. The Court does note, however, that the *DeLanney* rule does not preclude "recovery of economic damages even absent physical injury or property damage" under a negligent misrepresentation theory. *See Sharyland Water Supply Corp.*, 354 S.W.3d at 418-19 (citations omitted).

### 3.      Breach of warranty

Plaintiff alleges that Defendant expressly[8] warranted to Plaintiff that the Facility's natural gas supply would not be interrupted. Am. Compl. ¶ 33. Plaintiff further alleges that Defendant "breached the warranties . . . by disconnecting [Plaintiff] from its regular gas line, and by installing an alternative line that failed to provide [Plaintiff] with the warranted levels of gas supply at a critical time." *Id.* Defendant contends that any statements it made "could not qualify as warranties . . . because they were made years after the [Agreement] was executed." Mot. ¶ 13.

Under Texas law, whereas warranties relating to sales of goods are governed by the Uniform Commercial Code ("UCC"), warranties related to service transactions are governed by the common law of warranty. *See Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 574 (Tex. 1991) ("*FDP*"). Although natural gas is a good,[9] the Agreement is a contract for the *transportation* of natural gas, not for the *sale* of gas, and is therefore more akin to a services contract. *See* Agreement; Pl.'s Br. ¶ 8. *Cf.* 61 Am. Jur. 2d Pipelines § 4 ("Provisions of the [UCC] do not apply to a gas transportation and processing agreement, which is a contract for services, not goods[.]") (citing *Nw. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603 (Tex. 1998)).

---

[8] The Amended Complaint does not appear to allege an implied warranty claim. *See* Am. Compl. ¶ 33 ("[Defendant] made warranties to [Plaintiff] *by affirmation of fact, promise, and/or description*. [Defendant] warranted to [Plaintiff], among other things, that there would be no interruption in the gas supply or pressure during the testing to be conducted, that the alternative gas line would cause no problems, damages, losses, or disruption to [Plaintiff], and that [Plaintiff] needed to take no other action to protect itself from any possible disruption in service." (emphasis added)). Moreover, as described below, because the Agreement is a contract for services rather than for the sale of goods, an implied warranty claim is not available to Plaintiff. *See Top Rank, Inc. v. Gutierrez*, 236 F. Supp. 2d 637, 663-665 (W.D. Tex. 2001) (holding that implied warranty claims for services, as opposed to express warranty claims for services or implied warranty claims for goods, are not available under Texas common law).

[9] *See Aurora Natural Gas, L.L.C. v. Cont'l Natural Gas, Inc.*, No. CA 3:98–CV–1348–BC, 1999 WL 304561, at *4 n.7 (N.D. Tex. May 10, 1999); *Equitable Res. Mktg. Co. v. U.S. Gas. Transp., Inc.*, No. 05-99-00619-CV, 2001 WL 533808, at *4 (Tex. App. May 21, 2001); *see also* Tex. Bus. & Comm. Code § 2.107 ("A contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the sale of goods within this chapter if they are to be severed by the seller").

Accordingly, Plaintiff's breach of warranty claim is governed by the common law of Texas. Nevertheless, because the Uniform Commercial Code codified the common law of warranty, "reference to the Code is instructive" even when "the case at bar involves a service transaction." *FDP*, 811 S.W.2d at 575-76 (citations omitted). As a result, cases interpreting the Uniform Commercial Code's express warranty rules remain relevant in the context of a service transaction. *See FDP*, 811 S.W.2d at 574-76; *Raymond v. Rahme*, 78 S.W.3d 552, 562 (Tex. App. 2002).

An express warranty is an express affirmation of fact or promise made by the seller to the buyer that relates to the goods or services and becomes part of the basis of the bargain. *Raymond*, 78 S.W.3d at 562 (citing *Harris Packaging Corp. v. Baker Concrete Constr. Co.*, 982 S.W.2d 62, 66 (Tex. App. 1998); *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 890-91 (Tex. App. 1996)). To create an express warranty, the seller need not use such formal words as "warrant" or "guarantee" or have a specific intention to make a warranty. *See Fieldtech Avionics & Instruments, Inc. v. Component Control.com, Inc.*, 262 S.W.3d 813, 829 (Tex. App. 2008).

"Generally, a statement made by a seller after a contract has been made is not an express warranty because the buyer has already agreed to the bargain and cannot argue that [it] relied on the statement in entering into the contract." *Raymond*, 78 S.W.3d at 562 (citing *Harris Packaging Corp.*, 982 S.W.2d at 67). Here, Defendant's alleged assurances that Plaintiff's natural gas service would continue without interruption did not amount to an express warranty because they were post-contract affirmations made over a decade after the parties had already entered the Agreement. *See id.* (citing *Harris Packaging Corp.*, 982 S.W.2d at 66; *Chilton Ins. Co.*, 930 S.W.2d at 890-91).

25

Plaintiff responds by noting, correctly, that the primary term of the Agreement had expired by the time of the events giving rise to this Case. *See* Resp. ¶ 25; ECF No. 2-1, at 20. As a result, Plaintiff and Defendant had automatically extended the Agreement "on a year-to-year basis" subject to either party delivering "written notice of termination . . . no less than one hundred eighty (180) days prior to the end of . . . any extension." *See* ECF No. 2-1, at 20. Plaintiff therefore argues that because "the Agreement's primary term had expired and Plaintiff had a right to prevent renewal of the Agreement by written notice, the oral statement of Defendant may be viewed as a warranty of performance in order to avoid Plaintiff taking such a step in response." Resp. ¶ 25.

This argument fails because Plaintiff never alleges in the Amended Complaint that it would have refused to renew the Agreement if Defendant had not promised uninterrupted service. *See* Am. Compl. ¶¶ 9-10, 29-31. Plaintiff alleges only (1) that it informed Defendant that an interruption to its natural gas service would interfere with its peak season production; (2) that Defendant gratuitously assured Plaintiff that the Facility would continue to receive uninterrupted natural gas service; and (3) that Plaintiff began production in response. *See id.* ¶¶ 9-10. Therefore, Plaintiff did not allege that it agreed to renew the Agreement based on Defendant's alleged warranty, so Plaintiff has failed to allege that Defendant's assurances became part of the basis of the bargain. *See Raymond*, 78 S.W.3d at 562 (citing *Harris Packaging Corp.*, 982 S.W.2d at 66; *Chilton Ins. Co.*, 930 S.W.2d at 890-91). Plaintiff's breach of warranty claim therefore fails.

Plaintiff further argues that Defendant's assurances modified the Agreement and thereby amounted to an express warranty to the modified contract. Plaintiff is correct that "a post-contract statement that modifies a pre-existing contract may be considered an express warranty."

26

*Id.* (citing *Harris Packaging Corp.*, 982 S.W.2d at 67). However, as the Court explains in a subsequent section of this Order, Defendant's post-contract statements did not modify the Agreement due to lack of consideration. This argument therefore fails as well.

Given the foregoing, Plaintiff cannot sustain its breach of warranty claim. Again, however, Plaintiff may seek leave to further amend this claim if it can demonstrate good cause. *See Adams*, 2013 WL 1791373, at *4 (citing *Hart*, 199 F.3d at 248 n.6); Federal Rule of Civil Procedure 16(b)(4).

### 4.      Breach of contract

Plaintiff asserts two separate breach of contract claims against Defendant. The first, labeled "Count I," alleges that the terms of the Agreement required Defendant to redeliver to Plaintiff a sufficient level of natural gas to operate the Facility during the peak season, and that Defendant breached the Agreement by failing to do so. Am. Compl. ¶¶ 35-39. The second, labeled "Count II," alleges that Plaintiff and Defendant entered an oral contract that either was independent of the Agreement or modified the Agreement, whereby Defendant agreed to supply the Facility with uninterrupted gas service via the bypass pipeline, and that Defendant breached this oral contract. *Id.* For the following reasons, the Court denies the Motion as to Count I but grants the Motion as to Count II.

"The essential elements of a breach of contract claim" under Texas law "are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained as a result of the breach." *Simien v. Unifund CCR Partners*, 321 S.W.3d 235, 247 (Tex. App. 2010) (citing *Williams v. Unifund CCR Partners Assignee of Citibank*, 264 S.W.3d 231, 235-36 (Tex. App. 2008)). To satisfy the "valid contract" element, a plaintiff must show

(1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) meeting of the minds, (4) a communication that each party consented to the terms of the contract, (5) execution and delivery of the contract with intent it become mutual and binding on both parties, and (6) consideration.

*Expro Ams., LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 920 (Tex. App. 2011) (citing *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App. 2000)).

"Consideration is a present exchange bargained for in return for a promise[,]" and "consists of either a benefit to the promisor or a detriment to the promisee." *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (citing *Connell v. Provident Life & Accident Ins. Co.*, 224 S.W.2d 194, 196 (Tex. 1949); *Tripp Vill. Joint Venture v. MBank Lincoln Ctr.*, 774 S.W.2d 746, 749 (Tex. App. 1989)).

### a.      Count I: The Amended Complaint sufficiently alleges that Defendant breached the Agreement

The parties dispute whether the Amended Complaint sufficiently alleges a breach of contract claim based on Defendant's alleged failure to redeliver gas to the Facility. To determine whether Count I plausibly alleges a claim upon which the Court may grant relief, the Court must interpret the Agreement. In doing so, the Court rejects Plaintiff's argument that "[c]ontract interpretation or construction, if disputed, is not appropriate for resolution under a motion to dismiss," Resp. ¶ 17. Under Texas law, the meaning of contractual language is a question of law to be decided by the Court, so the Court is free – and indeed required – to interpret the Agreement to rule on the Motion. *See LVI Facility Servs., Inc. v. Watson Road Holding Corp.*, No. A–12–CV–672–LY, 2013 WL 5519588, at *4, *5 n.4 (W.D. Tex. Oct. 1, 2013) (citations omitted). *Accord Cruz v. CitiMortgage, Inc.*, Civil Action No. 3:11–CV–2871–L, 2012 WL 1836095, at *2 (N.D. Tex. May 21, 2012) (citations omitted). Accordingly, the Court considers Defendant's obligations under the Agreement to assess whether Plaintiff has plausibly alleged that Defendant breached them.

The Court's "primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract." *See Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000); *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983)). To determine the meaning of any particular contractual provision, the Court considers that clause in the context of all provisions of the Agreement. *See id.* (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). The Court must presume that the parties intended every clause in the contract "to have some effect." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (citing *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 331 (Tex. 1983)).

The first relevant provision of the Agreement is Paragraph 1.1, which provides that Plaintiff may "deliver or cause to be delivered to [Defendant] . . . not more than 200,000 Mcf per year at rates not to exceed 325 Mcf per day of natural gas." Agreement ¶ 1.1 (emphasis omitted). If Plaintiff does so, Defendant must, subject to the Interruptibility Clause, "receive, transport and redeliver . . . an Equivalent Quantity . . . of natural gas to [Plaintiff]." *Id*; *see also* App. A ¶ 1.10 (defining "Equivalent Quantity" as "Volume in Mcf's [sic] of gas transported by [Defendant] to [Plaintiff] at the [Facility] during a given period of time"). Thus, this provision does not require Defendant to transport to Plaintiff any fixed or variable minimum quantity of natural gas; Defendant is only obligated to redeliver as much gas as Plaintiff "deliver[s] or cause[s] to be delivered" to Defendant. *See* Agreement ¶ 1.1. Defendant's redelivery obligation is further subject to the Agreement's interruptibility provisions. *See id.* ¶¶ 1.1, 2.1.

The second relevant provision is Paragraph 1.3, which provides that "[i]t is expressly agreed and understood by the parties that nothing herein shall obligate [Plaintiff] to transport any

minimum quantity of natural gas[.]" Agreement ¶ 1.3. Note that this provision is written to apply to Plaintiff, not to Defendant. *See* Agreement at 1 (defining the term "Shipper" in Agreement ¶ 1.3 and elsewhere as Plaintiff). Thus, Plaintiff's delivery obligations under the Agreement are subject to a ceiling, but not a floor; Plaintiff is not required to deliver or cause to be delivered any minimum level of gas to Defendant to redeliver to the Facility, but Plaintiff may not deliver more than 200,000 Mcf per year or 325 Mcf per day to Defendant. *Compare id.* ¶ 1.1 *with id.* ¶ 1.3.

That said, Paragraph 4.2 provides that "[Plaintiff] agrees to deliver sufficient volumes of gas to [Defendant] so that the minimum amount owed by [Plaintiff] for transportation under this Agreement, excluding [certain taxes and fees], shall be $7,525.00 each Contract Year." *Id.* ¶ 4.2. This, at first blush, appears inconsistent with Paragraph 1.3's provision that Plaintiff has no obligation to deliver to Defendant any minimum level of natural gas, but the two provisions may be reconciled. *See Seagull Energy E & P, Inc.*, 207 S.W.3d at 345 (citing *Coker*, 650 S.W.2d at 393) (holding that a court should determine the meaning of any particular contractual provision by considering the clause in the context of the contract as a whole); *Heritage Res., Inc.*, 939 S.W.2d at 121 (citing *Ogden*, 662 S.W.2d at 331) (holding that a court should interpret a contract to give effect to all provisions). Paragraph 4.2 continues as follows: "If at the end of a Contract Year the amount owed by [Plaintiff] to [Defendant] is less than [$7,525.00], [Defendant] shall bill [Plaintiff] for the difference[.]" Agreement ¶ 4.2. Therefore, although there is no fixed or variable quantity of natural gas Plaintiff must deliver to Defendant, if Plaintiff does not deliver enough natural gas to incur $7,525.00 of pre-tax, pre-fee transportation expenses, Defendant is entitled to charge that minimum amount, even if Defendant did not redeliver $7,525.00 worth of natural gas to Plaintiff during the contract year. *See id.* ¶¶ 1.1, 1.3, 4.2.

Thus, reading Paragraphs 1.1, 1.3, and 4.2 holistically, the Court concludes that Defendant's obligation under the Agreement is to redeliver only that quantity of natural gas that Plaintiff first delivers or causes to be delivered to Defendant. *See id*. ¶ 1.1. Defendant's redelivery obligations are limited by its ability to exercise the Interruptibility Clause. *See id*. ¶ 1.1 (providing that redelivery will occur "on an interruptible basis"); *id*. ¶ 2.1 (the Interruptibility Clause). Because (1) Defendant need only redeliver that volume of natural gas that Plaintiff first delivers to it; and (2) Plaintiff is – subject to a $7,525.00 penalty – not required to deliver any minimum level of gas to Defendant; by extension Defendant has no obligation under the Agreement to deliver to the Facility any minimum volume of natural gas. *See id*. ¶¶ 1.1, 1.3, 4.2.

Likewise, the Requirements Clause, despite its name, does *not* require Defendant to redeliver to Plaintiff, at minimum, the quantity of natural gas Plaintiff needs to operate the Facility. *See id*. ¶ 1.2; Pl.'s Br. ¶ 10. Rather, as Plaintiff agrees, the Requirements Clause operates more like an exclusivity provision that prevents Plaintiff from obtaining natural gas from sources other than Defendant. *See* Agreement ¶ 1.2; Pl.'s Br. ¶ 7. *See also W. Tex. Gas, Inc. v. Carthel Bros.*, No. 07-06-0168-CV, 2007 WL 3194560, at *1 (Tex. App. Oct. 30, 2007) (discussing a requirements clause in a natural gas contract akin to the Requirements Clause of the Agreement). The Agreement therefore does not require Defendant to redeliver any natural gas to the Facility at all unless (1) Plaintiff first delivers a quantity below the contractual maximum to Defendant and (2) Defendant does not or cannot validly exercise the Interruptibility Clause.

The Court must therefore consider whether the Amended Complaint alleges sufficient factual matter to trigger Defendant's redelivery obligations under the Agreement. The Court concludes that Plaintiff has. Though the Amended Complaint does not explicitly allege that

31

Plaintiff delivered any specified quantity of gas to Defendant, *see* Am. Compl., the Amended Complaint does contain allegations from which the Court can infer that Plaintiff delivered some level of gas for Defendant to redeliver. *See* Am. Compl. ¶¶ 12, 14, 16-19. Therefore, assuming Plaintiff's allegations are correct, the Agreement obligated Defendant to deliver an equivalent quantity to the Facility unless it permissibly exercised the Interruptibility Clause. *See* Agreement ¶¶ 1.1, 1.3, 2.1, 4.2.

To reiterate, the Interruptibility Clause reads as follows:

Notwithstanding any other provision to the contrary, [Defendant] shall have the unconditional right, without giving notice, at any and all times during the term hereof, to immediately decrease, suspend or discontinue in whole or in part the receipt, transportation or delivery of gas quantities under this Agreement and [Defendant] shall not be liable, in any respect, to [Plaintiff] by reason of any exercise of said right. Notwithstanding the foregoing, [Defendant] shall, to the extent practicable, give [Plaintiff] at least two hours' notice before effecting any suspension or discontinuation of service.

*Id*. ¶ 2.1.

Defendant argues that the Interruptibility Clause allows Defendant to cease natural gas service to the Facility at any time and for any reason. Mot. ¶¶ 5, 20, 22; Reply ¶¶ 15, 17-18. Therefore, argues Defendant, it did not breach the Agreement by failing to provide the Facility uninterrupted service. Mot. ¶¶ 5, 20, 22; Reply ¶¶ 15, 17-18.

Plaintiff responds that the Interruptibility Clause excuses "interruptions only due to capacity and priority issues," and not interruptions caused by improper pipeline construction and maintenance. Resp. ¶¶ 14-20. In other words, argues Plaintiff, the Interruptibility Clause only excuses "interruptions due to a system-wide shortage of gas" that require Defendant to favor certain high-priority customers, like hospitals and fire stations, over other customers; it does not allow Defendant "to arbitrarily and capriciously [discontinue gas service] to a customer on a whim, when there is plenty of gas supply and capacity in the system." *Id*. ¶¶ 14-15.

For the following reasons, the Court concludes that the Interruptibility Clause is properly interpreted to allow Defendant to interrupt natural gas service to the Facility where necessary to serve its higher-priority customers or to preserve the operability or safety of the distribution system. It does not afford Defendant the ability to interrupt service for any reason whatsoever, and it does not excuse the mechanical failures alleged here.

If, as Defendant argues, the Interruptibility Clause excused all failures to provide natural gas service to the Facility, no matter the cause, the Force Majeure Clause would be effectively meaningless. *See Heritage Res., Inc.*, 939 S.W.2d at 121 (citing *Ogden*, 662 S.W.2d at 331) (holding that a court should presume every clause of a contract "to have some effect"). The Force Majeure Clause excuses performance of any party unable to perform the Agreement due to the "breakage or freezing of pipelines," "the making of repairs or alterations to lines of pipe or plants," the "partial or entire failure of gas supply," or other circumstances "not reasonably within the control of the party claiming 'force majeure.'" Agreement App. A ¶ 8.1. Under Defendant's interpretation, the Interruptibility Clause excuses the Defendant from any failure to supply natural gas to the Facility, regardless of whether that failure stems from factors within Defendant's control or beyond it. *See* Mot. ¶ 6 ("[T]he Agreement precludes recovery of losses for service interruptions regardless of the reason for the interruptions."). If that were true, Defendant could escape its redelivery obligations under any circumstances without any need to exercise the Force Majeure Clause. Because Defendant's interpretation would render an entire clause of the Agreement mere surplusage, the Court cannot accept it. *See Heritage Res., Inc.*, 939 S.W.2d at 121 (citing *Ogden*, 662 S.W.2d at 331).

Additionally, if Defendant was correct that it could avoid its obligations under the Agreement for any reason whatsoever after Plaintiff had already delivered gas to it, then the

33

Agreement would not only be a sharply anomalous deviation from the overwhelming majority of natural gas contracts, but it also would run the risk of being an illusory contract lacking in mutuality. As the Eighth Circuit stated in a case involving a similar interruptible gas contract,

> [T]he mere fact that the agreement had an interruptible basis . . . could not be said . . . to have made the situation where [the gas supplier] could arbitrarily have refused to supply [the purchaser] with any power-plant gas, or where . . . its promise to supply such gas, with interruptible safeguard, would be so illusory or lacking in substance in the parties' relationships as to leave it incapable of constituting an adequate legal consideration.

*City of Hastings, Neb. v. Kan.-Neb. Natural Gas Co.*, 226 F.2d 419, 423 (8th Cir. 1955). *Accord* Arthur J. Wright, *Contractual Issues in Marketing Natural Gas in the 1990's*, 36 RMMLF-INST 16 § 16.11[3] (1990) (stating that interpreting an interruptibility clause to excuse all interruptions regardless of the cause would "render[] virtually meaningless the transporter's commitments to the shipper in regard to moving any definite volume of gas").

In other words, if the Interruptibility Clause allowed Defendant to arbitrarily refuse to supply Plaintiff with gas, the Court would be faced with the serious question of whether the Agreement is an enforceable contract predicated upon mutual consideration. *See City of Hastings, Neb.*, 226 F.2d at 423. To be clear, the Court does not go so far as to conclude that the Agreement would *necessarily* be invalid if Defendant's interpretation was correct, but the Court does conclude it is highly unlikely that the Interruptibility Clause allows Defendant to simply decline to perform its obligations for any reason and thereby escape liability.

Thus, the Interruptibility Clause cannot mean what Defendant argues it means. The Court therefore must give the clause the interpretation that makes the most sense in light of the language used, the context in which the Agreement was drafted, the other provisions of the Agreement, and general principles of contract law.

The Court first notes that the meaning of the Interruptibility Clause is clarified by the 2005 amendment, which contains the following condition: "Transportation of natural gas hereunder may be interrupted or curtailed *to preserve the operational safety, reliability, or*

34

*integrity of the distribution system* or in case of shortage of threatened shortage of gas supply

from any cause whatsoever, *to conserve gas for residential and other higher priority customers*

*served*." *See* ECF No. 2-1, at 28 ¶ 4 (emphasis added). This suggests that the Interruptibility

Clause does not excuse all interruptions regardless of the reason, but rather excuses interruptions

due to supply shortages, and perhaps also when necessary to preserve the operability or safety of

the pipeline. *See Seagull Energy E & P, Inc.*, 207 S.W.3d at 345 (citing *Coker*, 650 S.W.2d at

393) (holding that a contractual provision should be interpreted holistically alongside other

provisions of the contract).

       This interpretation is consistent with the usual meaning of an interruptible natural gas

contract in the industry. Where, as here, a contract is negotiated in the context of a highly

regulated, highly technical industry, the court may consult the technical or industry-specific

meaning of phrases and clauses to interpret the contract, even where the contract is otherwise

unambiguous. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (citations

omitted) (permitting reference to technical or industry-specific meanings of phrases); *Sun Oil*

*Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731-32 (Tex. 1981) (permitting reference to the

circumstances surrounding the formation of a contract even if the contract is unambiguous). In

the natural gas industry, whereas

> [f]irm service is the guaranteed right to receive a certain volume of gas via a
> specific pipeline[,] [i]nterruptible service is the right to receive a certain volume
> of gas out of the excess capacity the pipeline has available, *i.e.*, the pipeline's
> surplus capacity left after the pipeline has met the needs of its firm service
> customers.

*El Paso Mktg., L.P.*, 383 S.W.3d at 143 n.21 (quoting *Midwest Gas Servs., Inc. v. Ind. Gas Co.,*
*Inc.*, 317 F.3d 703, 707 n.2 (7th Cir. 2003)).

Thus, the fact that the Agreement is an interruptible service contract does not mean that it affords

Defendant an absolute privilege to avoid its redelivery obligations. Rather, it means that

Defendant may permissibly elect to not provide a steady level of natural gas to Plaintiff and other interruptible customers when Defendant has already provided its full supply to its firm service customers. Federal and state courts across the country virtually unanimously give natural gas interruptibility clauses this interpretation, and the Court has found no cases that hold or imply that an interruptible service contract excuses a failure to supply gas due to shoddy pipeline construction and maintenance.[10] Commentators have similarly noted that "[a] court, and many end markets, simply will not place such a liberal interpretation on interruptible language" as Defendant suggests, and that courts "generally narrowly construe" interruptibility clauses.

---

[10] *See Duke Energy Trading & Mktg., L.L.C. v. FERC*, 315 F.3d 377, 379 (D.C. Cir. 2003) ("Interruptible capacity can be interrupted *when necessary to provide service to higher priority customers*, such as firm customers." (emphasis added)); *Borden, Inc. v. FERC*, 855 F.2d 254, 256 (5th Cir. 1988); *Cities of Lakeland & Tallahassee, & Gainsville Reg'l Utils. v. FERC*, 702 F.2d 1302, 1304 (11th Cir. 1983); *Hercules Inc. v. FPC*, 552 F.2d 74, 79 (3d Cir. 1977); *George A. Koteen Assocs., Inc. v. Fulton Indus., Inc.*, 438 F.2d 625, 626 n.1 (2d Cir. 1971); *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 373 F. Supp. 2d 631, 634 (S.D. W.Va. 2005) ("The PAL service would allow shippers to park gas on the pipeline system as well as borrow gas from the pipeline system on an interruptible basis, *which means it would be subject to interruption by higher priority shipping contracts*." (emphasis added)); *Norcen Energy Res. Ltd. v. Pac. Gas & Elec. Co.*, No. C-94-0911-VRW, 1994 WL 519461, at *1 (N.D. Cal. Sept. 19, 1994) ("As its name suggests, interruptible service can be interrupted by the pipeline owner, in this case PGT, *to service customers who have noninterruptible, or firm, transportation rights*." (emphasis added)); *City of Chanute, Kan. v. Williams Natural Gas Co.*, 678 F. Supp. 1517, 1520 (D. Kan. 1988); *Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 409 S.W. 371, 374 (Mo. 2013) ("[T]he timing of supplying interruptible gas may be interrupted *if the supplier has an inadequate quantity of gas to meet all commitments at a specific time*." (emphasis added)); *Anheuser-Busch Cos. v. Va. Natural Gas, Inc.*, 418 S.E.2d 857, 858 (Va. 1992) ("'Interruptible' service is inferior to 'firm' service because interruptible service can be discontinued by the utility *when necessary to serve its firm customers* during, for example, the time of peak demand on the utility's system." (emphasis added)); *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 42 & n.1 (Tenn. 1986); *Wis. Ass'n of Mfrs. & Commerce, Inc. v. Pub. Serv. Comm'n of Wis.*, 301 N.W. 247, 249 (Wis. 1981); *Utah-Idaho Sugar Co. v. Intermountain Gas Co.*, 597 P.2d 1058, 1060 (Idaho 1979); *State ex rel. Utils. Comm'n v. City of Durham*, 193 S.E.2d 95, 99-100 (N.C. 1972); *Wis. End-User Gas Ass'n v. Pub. Serv. Comm'n of Wis.*, 581 N.W.2d 556 (Wis. App. 1998) ("A customer which elects interruptible service agrees to cease using gas on what are termed 'constraint days' so the needs of higher priority customers may be met."); *Midwest Gas Users Ass'n v. State Corp. Comm'n*, 623 P.2d 924, 926 (Kan. App. 1981) ("Large commercial and large industrial users are considered 'interruptible' customers in that service to those users may be curtailed at times *when total demand on the system exceeds supply*." (emphasis added)). The Court has found only a single case that defined an interruptibility clause in the sweeping manner suggested by Defendant, and that case did so without analysis. *See North Star Steel Co. v. United States*, 58 Fed. Cl. 720, 723 n.2 (Fed. Cl. 2003). Although *Arkansas Power & Light Company v. Federal Power Commission* discusses an interruptibility clause, worded differently than the Interruptibility Clause at issue here, that could be read as broadly as Defendant suggests, *see* 517 F.2d 1223, 1230 & n.21 (D.C. Cir. 1975), that decision contemplates that regulatory requirements could limit the breadth of the interruptibility clause, *see id.* at 1230-31, and recognizes that interruptibility clauses "generally provide that service is interruptible" only "to the extent necessary to protect human needs." *see id.* at 1232.

Wright, 36 RMMLF-INST 16 § 16.03[4][a] (citing *KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769 (Colo. 1985); *Bowaters Carolina Corp. v. Carolina Pipeline Co.*, 193 S.E.2d 129 (S.C. 1972)).

Defendant responds that the generally understood meaning of interruptibility clauses in the industry is irrelevant; regardless of whether or not most interruptibility clauses in other natural gas contracts allow interruptions only in accordance with a priority scheme, the Interruptibility Clause of the Agreement is phrased unconditionally without reference to prioritizing firm over interruptible customers. *See* Reply ¶ 6. Thus, argues Defendant, the Interruptibility Clause authorizes Defendant to interrupt service at any time and for any reason. *See id*. The Court recognizes that "there are many different versions of interruptibility clauses and some variance among people in the natural gas field as to the meaning of 'firm' and 'interruptible.'" *Ark. Power & Light Co. v. FPC*, 517 F.2d 1223, 1233 (D.C. Cir. 1975). However, Defendant's argument nevertheless fails for two reasons. First, as described above, a court may consult the industry-specific and technical meanings of words, as well as the context in which the parties entered the contract, to interpret a contract, even where the contract is otherwise unambiguous. *See Valence Operating Co.*, 164 S.W.3d at 662 (citations omitted); *Sun Oil Co. (Del.)*, 626 S.W.2d at 731-32. The fact that virtually all interruptible gas contracts discussed in the case law contemplate interruptions in service only when necessary to fulfill a provider's commitments to its firm customers renders it highly improbable that the Interruptibility Clause affords Defendant carte blanche to escape its contractual obligations whenever it so chooses. Secondly, as described above, the Force Majeure Clause and the requirement of mutual consideration renders it particularly unlikely that Defendant's interpretation is correct. Finally, the 2005 Amendment's clarification of the Interruptibility

Clause forecloses Defendant's interpretation. *See* ECF No. 2-1, at 28 ¶ 4 ("Transportation of natural gas hereunder may be interrupted or curtailed *to preserve the operational safety, reliability, or integrity of the distribution system* or in case of shortage of threatened shortage of gas supply from any cause whatsoever, *to conserve gas for residential and other higher priority customers served*.") (emphasis added).

Defendant insists that interpreting the Agreement to not allow Defendant to interrupt service at its whim will deprive it of the benefit of its bargain, as Plaintiff "willingly gave away firm service in exchange for an interruptible service rate." Def's Br. ¶ 29. This is not so. Under the Court's interpretation, Defendant still retains a powerful contractual right: the ability to favor its firm customers over Plaintiff and its other interruptible customers without incurring liability during supply shortfalls. The 2005 amendment and the Force Majeure Clause further contemplate interruptions due to occurrences outside Defendant's control,[11] as well as safety and operability concerns. In exchange for these concessions, Plaintiff pays a discounted transportation rate. Barring a valid reason for interrupting service, however, Defendant is obligated to redeliver to the Facility a quantity of gas equivalent to the amount below the contractual maximum that Plaintiff first delivers to Defendant. Plaintiff has sufficiently alleged that Defendant has failed to do just that.

Thus, the Court denies the Motion as to Count I. Although, at a later stage in the Case, Defendant may be able to produce facts that demonstrate that Defendant did indeed validly exercise the Interruptibility Clause in a manner consistent with the Court's interpretation above, Plaintiff has at least alleged a breach of the Agreement that survives a Rule 12(b)(6) motion to

---

[11] Defendant does not argue at this stage of the Case that its alleged failure to transport gas to the Facility was excused by the Force Majeure Clause. *See* Def.'s Br. ¶¶ 21-22.

dismiss.

> **b.    Count II: Plaintiff has failed to allege that Defendant's July 2011 promise was supported by consideration**

Plaintiff argues in Count II that the parties "entered into a new and independent oral contract with respect to the testing and installation of bypass gas line [sic]" in July 2011, whereby Defendant assured Plaintiff that the Facility would receive uninterrupted natural gas service while Defendant tested the main pipeline. Am. Compl. ¶¶ 9-10, 41. Plaintiff argues that Defendant breached this new or modified agreement by "fail[ing] to provide [Plaintiff] with the promised levels of gas supply at a critical time." *Id.* ¶ 41. Defendant responds that Plaintiff cannot show that the parties entered into a new contract or modified the Agreement because the new agreement would either violate the statute of frauds or lack consideration. Mot. ¶¶ 14-19.

It is unclear whether Plaintiff argues that the July 2011 assurances amounted to a new contract, a modification of the Agreement, or both. The Court need not resolve that question, however, because either way the assurance would need to be supported by consideration to give rise to a contractual obligation. "Consideration is a present exchange bargained for in return for a promise[,]" and "consists of either a benefit to the promisor or a detriment to the promisee." *Roark*, 813 S.W.2d at 496 (citing *Connell*, 224 S.W.2d at 196; *Tripp Vill. Joint Venture*, 774 S.W.2d at 749). For the following reasons, Plaintiff does not sufficiently allege that Defendant received consideration for the July 2011 promise. Plaintiff does not allege that it gave Defendant anything in return for its promise of uninterrupted service. *See* Am. Compl. ¶¶ 9-10. Nor did Plaintiff agree to forbear from doing anything that it otherwise had a right to do. As discussed above, Plaintiff does not allege that it agreed to forgo exercising the Agreement's termination provision in exchange for Defendant's July 2011 promise. *See id.* Plaintiff alleges merely that

Defendant made a gratuitous promise. *See id.* (failing to allege any facts indicating that Plaintiff forbore any action or that Defendant received any benefit in exchange for the July 2011 promise). A gratuitous promise cannot give rise to a contractual obligation. *See Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986) (citing *Rhoads Drilling Co. v. Allred*, 70 S.W.2d 576, 583 (Tex. 1934); *Mandril v. Kasishke*, 620 S.W.2d 238 (Tex. App. 1981)); *Expro Ams., LLC*, 351 S.W.3d at 920 (citing *Angelou*, 33 S.W.3d at 278).

Plaintiff argues that it need not negate Defendant's lack of consideration argument to survive a motion to dismiss because "[a] plaintiff is not required to negate in its complaint every potential defense that might be raised by a defendant." Resp. ¶ 27. However, consideration is an element Plaintiff must ultimately satisfy to establish that the putative contract alleged in Count II is valid, and therefore to establish a claim for breach of contract. *See Hathaway*, 711 S.W.2d at 228 (citing *Rhoads Drilling Co.*, 70 S.W.2d at 583; *Mandril*, 620 S.W.2d 238); *Expro Ams., LLC*, 351 S.W.3d at 920. Thus, the burden is on Plaintiff to allege facts demonstrating the existence of consideration, not on Defendant to negate it. *See Twombly*, 550 U.S. at 555 (placing the burden on the plaintiff "to provide the grounds of his entitlement to relief" at the motion to dismiss stage). Because Plaintiff has failed to do so, the Court grants the Motion insofar as it seeks to dismiss Count II.

Again, Plaintiff may seek leave to further amend the Amended Complaint if Plaintiff (1) can allege facts that would indicate that Defendant's July 2011 promise was in fact supported by consideration and (2) can demonstrate good cause. *See Adams*, 2013 WL 1791373, at *4 (citing *Hart*, 199 F.3d at 248 n.6); Federal Rule of Civil Procedure 16(b)(4). However, the Court reaches no conclusion here regarding whether Plaintiff would need to plead additional facts to satisfy the elements of its breach of contract claim in Count II other than consideration. In

particular, the Court reaches no decision regarding whether the clauses barring oral modification of the Agreement would defeat Count II even if consideration existed. *See* Agreement ¶ 1.4; Agreement App. A ¶ 11.2.

### 5. Promissory estoppel

Plaintiff's final claim alleges promissory estoppel against Defendant based on Defendant's promise that the Facility would receive uninterrupted natural gas service. Am. Compl. ¶¶ 45-48. Defendant replies that promissory estoppel is inapplicable because there was no "promise to sign a written agreement that had been prepared and would satisfy the statute of frauds," and because Plaintiff has failed to allege reliance damages. Mot. ¶¶ 23-24; Reply ¶¶ 19-21.

Promissory estoppel is normally a defensive theory, but it may serve as an independent affirmative cause of action when the plaintiff is unable to plead a successful breach of contract claim. *See Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 673 (Tex. App. 2010) (citing *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965); *Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 163 (Tex. App. 2008)). Promissory estoppel allows a court to enforce "an otherwise unenforceable oral agreement." *Hairston v. S. Methodist Univ.*, --- S.W.3d ----, 2013 WL 1803549, at *6 (Tex. App. Apr. 30, 2013). As such, "[p]romissory estoppel is not applicable to a promise covered by a valid contract between the parties." *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank*, 400 S.W.3d 139, 146 (Tex. App. 2013). Promissory estoppel "does not create a contract where none existed before, but only prevents a party from insisting" that an enforceable contract does not exist. *Wheeler*, 398 S.W.2d at 96-97 (citations omitted). Therefore, the Court assesses whether Plaintiff has pleaded sufficient facts to rehabilitate its unsuccessful breach of contract claim relating to the failed contract modification alleged in Count II. *See Plaza at Turtle Creek, Ltd. v. Henry Bldg.,*

41

*Inc.*, No. 08-00-00416-CV, 2002 WL 59603, at *6 (Tex. App. Jan. 17, 2002) (allowing promissory estoppel claim to proceed, even where an express contract existed between the parties, where plaintiff was otherwise barred from recovering on its breach of contract claim). *See also DeNucci v. Moretti*, No. 03-98-00114-CV, 1999 WL 250141, at *8 (Tex. App. Apr. 29, 1999) (allowing the allegation of inconsistent claims of promissory estoppel and breach of contract).

"The elements of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon, and (3) substantial reliance by the promisee to [its] detriment." *Garcia v. Lucero*, 366 S.W.3d 275, 280 (Tex. App. 2012) (citing *Kelly v. Rio Grande Computerland Grp.*, 128 S.W.3d 759, 769 (Tex. App. 2004)). Some Texas courts add the additional element that "enforcing the promise is necessary to avoid injustice."[12] *See Collins v. Walker*, 341 S.W.3d 570, 574 (Tex. App. 2011) (citing *Sipco Servs. Marine v. Wyatt Field Serv. Co.*, 857 S.W.2d 602, 605 (Tex. App. 1993)).

"A 'promise' is a 'manifestation of an intention to act . . . in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made.'" *Rice*, 324 S.W.3d at 673 n.14 (citing Black's Law Dictionary 1332 (9th ed. 2009)). The promise "must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action," and it "must be more than mere speculation concerning future events, a statement of hope, or an expression of opinion,

---

[12] A few Texas courts add the additional element that a party claiming promissory estoppel "must have used due diligence to ascertain the truth of the matters upon which [it] relies in acting to [its] detriment," but this is by far the minority position, and the decisions that add this element are unpublished and lack precedential value. *See State Farm Lloyds v. Bold Roofing Co.*, No. 05-97-01908-CV, 2000 WL 257772, at *1 (Tex. App. Mar. 9, 2000) (citations omitted); *Puckett v. Star Delivery Serv.*, No. 14-96-01518-CV, 1998 WL 436313, at *4 (Tex. App. July 30, 1998) (citations omitted).

expectation, or assumption." *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 635 (Tex. App. 2012) (citations omitted). "To show detrimental reliance, the plaintiff must demonstrate that [it] materially changed [its] position in reliance on the promise." *Trevino & Assocs. Mech., L.P.*, 400 S.W.3d at 146 (citations omitted).

For the following reasons, Plaintiff has sufficiently alleged a promissory estoppel claim. *See El Paso Healthcare Sys., Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695, 699 (Tex. App. 1997) (holding that evidence was sufficient to support promissory estoppel verdict where party made promise "outside both parties' contractual responsibilities"). Plaintiff has alleged that Defendant made a promise: namely, that Defendant would ensure that Plaintiff would continue to receive natural gas service during the pipeline testing. *See* Am. Compl. ¶¶ 9-10. This promise was specific and definite, was not mere speculation as to future events, and was not illusory. *See Landmark Org., L.P. v. Tremco Inc.*, No. 03–07–00673–CV, 2010 WL 2629863, at *7 (Tex. App. June 30, 2010); *Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, at 558-59 (Tex. App. 1998) (citations omitted). Defendant could foresee that making this promise could have induced Plaintiff to take preparatory steps to produce its products. *See McAnelly v. Brady Med. Clinic, P.A.*, No. 03-04-00095-CV, 2004 WL 2556634, at *3 (Tex. App. Nov. 12, 2004); *Kelly*, 128 S.W.3d at 769; *Citizens Bank & Trust Co. of Baytown v. Ertel*, No. 01-98-00548-CV, 2001 WL 26141, at *6 (Tex. App. Jan. 11, 2001). Plaintiff has alleged that it did in fact incur expenses in reliance: namely, by hiring laborers and beginning to process products on its assembly line. *See* Am. Compl. ¶ 25. This amounts to a material change in position. *See Sandel v. ATP Oil & Gas Corp.*, 243 S.W.3d 749, 753-54 (Tex. App. 2007) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 379 (Tex. App. 2007)); *Papas Telecasting Cos. v. Lee Enters., Inc.*, No. 08-00-00394-CV, 2002 WL 59693, at *6 (Tex.

43

App. Jan. 17, 2002). Plaintiff's alleged reliance on Defendant's promise was also reasonable and justified. *See Allied Vista, Inc.*, 987 S.W.2d at 142. Finally, Plaintiff has plausibly alleged that enforcement of the promise is necessary to avoid injustice. *See McAnelly*, 2004 WL 2556634, at *3; *Cobb v. W. Tex. Microwave Co.*, 700 S.W.2d 615, 616-17 (Tex. App. 1985). Therefore, Plaintiff has plausibly demonstrated entitlement to relief. *See Twombly*, 550 U.S. at 555.

Defendant argues that Plaintiff's promissory estoppel claim must fail because a promissory estoppel claim must be predicated on a promise to sign a written agreement that complies with the statute of frauds. Mot. ¶ 23; Reply ¶ 19. Defendant is partially correct: "When promissory estoppel is raised to bar the application of the statute of frauds, there is an additional requirement that the promisor promised to sign a written document complying with the statute of frauds."[13] *Bearden Investigative Agency v. Melvin*, No. 2-02-078-CV, 2003 WL 194729, at *7 (Tex. App. Jan. 30, 2003) (citing *Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982); *'Moore' Burger, Inc. v. Phillips*, 492 S.W.2d 934, 940 (Tex. 1973) (op. on reh'g); *Ford v. City State Bank*, 44 S.W.3d 121, 139 (Tex. App. 2001)). *See also Sonnichsen v. Baylor Univ.*, 47 S.W.3d 122, 124-27 (Tex. App. 2001) (holding that the written agreement in question "must be in writing at the time the oral promise to sign [that agreement] is made").

This does not render Plaintiff's promissory estoppel claim unavailing, however, because the promise Plaintiff seeks to enforce does not fall within the statute of frauds. The relevant provision of the statute of frauds, Texas Business and Commercial Code § 26.01(b)(6), requires "an agreement which is not to be performed within one year from the date of making the

---

[13] Alternatively, a promissory estoppel claim may survive a statute of frauds defense if the plaintiff can "show that the promisor . . . misrepresented that the statute of frauds was satisfied." *Citizens Bank & Trust Co. of Baytown*, 2001 WL 26141, at *5 (citing *CRSS Inc. v. Runion*, 992 S.W.2d 1, 7 (Tex. App. 1995); *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 707 (Tex. App. 1988) ("*Petrade Int'l*")). Plaintiff alleges no misrepresentation of this sort.

agreement" to be in writing. At the time of the events of the Case, the primary term of the

Agreement had expired, and the Agreement had been renewed pursuant to its year-to-year

renewal provision. *See* ECF No. 2-1, at 20. That is, each renewal of the Agreement was exactly

one year long, such terms of the Agreement as renewed could be completed within one year.

The Agreement as renewed therefore fell outside the statute of frauds. *See Hogan v. Crawford*,

31 Tex. 633, 633 (Tex. 1869) (stating that a year-to-year contract falls outside the statute of

frauds); *Holloway v. Dekkers*, 380 S.W.3d 315, 321-23 (Tex. App. 2012) (same); *Hill v. Hunter*,

157 S.W. 247, 253 (Tex. Civ. App. 1913) (same). *Accord Saucedo v. Rheem Mfg. Co.*, 974

S.W.2d 117, 125 (Tex. App. 1998) (holding that renewable annual contract "could have been

performed in one year and was therefore excused from the statute of frauds") (citing *Winograd v.

Willis*, 789 S.W.2d 307, 310-11 (Tex. App. 1990)). Thus, an oral modification to the Agreement

whereby Defendant agreed to provide uninterrupted natural gas service to the Facility for the

remainder of the renewal period would not violate the statute of frauds. *See Enex Res. Corp. v.

Tex. Crude, Inc.*, No. 05-94-00641-CV, 1994 WL 720267, at *4 (Tex. App. Dec. 30, 1994)

("Oral modification of a contract does not violate the Statute of Frauds if neither the portion of

the written contract affected by the subsequent modification, nor the matter encompassed by the

modification itself is required to be in writing.") (citing *Lone Star Steel Co. v. Scott*, 759 S.W.2d

144, 153 (Tex. App. 1988)). As explained above, Count II fails not due to noncompliance with

the statute of frauds, but rather due to lack of consideration.[14] As a result, Plaintiff's promissory

estoppel claim may survive a motion to dismiss even though Plaintiff does not allege a promise

---

[14] Again, the Court does not decide whether Count II also fails due to a failure to comply with Paragraph 1.4 of the
Agreement and Paragraph 11.2 of Appendix A, which prohibit oral modification of the Agreement notwithstanding
the statute of frauds.

to sign a written agreement. *See Garcia*, 366 S.W.3d at 276-77, 281 (holding that plaintiff presented more than a scintilla of evidence to support a promissory estoppel claim not predicated upon a promise to sign a written agreement). Therefore, the Court does not dismiss Plaintiff's promissory estoppel claim on statute of frauds grounds.

Defendant further argues that Plaintiff's promissory estoppel claim cannot succeed because promissory estoppel permits only the recovery of reliance damages, and Defendant contends that Plaintiff has not pleaded reliance damages. Mot. ¶ 24; Reply ¶ 20. *See also Alwani v. BWKR, L.L.C.*, No. 2-04-291-CV, 2005 WL 1791995, at *2 (Tex. App. July 28, 2005) ("Damages are an essential element of . . . promissory estoppel.") (citing *MCN Energy Enters., Inc. v. Omagro de Colom., L.D.C.*, 98 S.W.3d 766, 774 (Tex. App. 2003)). Defendant is partially correct that a party that successfully brings a promissory estoppel claim may recover for money expended in reliance on the promise, but not for loss of profits that the party would have earned had the promisor fulfilled its promise. *See Wheeler*, 398 S.W.2d at 97 (citing *Goodman v. Dicker*, 169 F.2d 684 (D.C. Cir. 1948)). Thus, promissory estoppel only "put[s] the promisee in the position [it] would have been in had [it] not acted in reliance upon the promise." *Id.* (citations omitted). Nevertheless, Defendant's argument fails because Plaintiff has in fact pleaded reliance damages: namely, that Plaintiff hired laborers and incurred production costs in reliance on Defendant's promise that natural gas service to the Facility would continue. *See* Am. Compl. ¶ 25. *See also Jones v. Landry's Seafood Inn & Oyster Bar-Galveston, Inc.*, 328 S.W.3d 909, 914-15 (Tex. App. 2010) ("*Landry's Seafood Inn*") (holding that plaintiff produced sufficient evidence of reliance to avoid summary judgment where plaintiff would have sought less expensive medical treatment had defendant not promised to pay her dental bills); *DeNucci*, 1999 WL 250141, at *7-8. Plaintiff has therefore sufficiently alleged that there is some value of

46

damages greater than zero that would restore Plaintiff to its former position before Plaintiff relied on Defendant's alleged promise. *See MTM Elec. Corp. v. Bechtel Int'l, Inc.*, No. 14-00-01469-CV, 2001 WL 1474495, at *4 (Tex. App. Nov. 21, 2001). Thus, the Court declines to dismiss Plaintiff's promissory estoppel claim on this ground. Defendant is correct, however, that Plaintiff may not recover lost profits or any other damages exceeding reliance damages should it ultimately prevail on its promissory estoppel claim at trial or otherwise. *See Wheeler*, 398 S.W.2d at 97.

Thus, the Court denies the Motion insofar as it seeks to dismiss Plaintiff's promissory estoppel claim. The Court notes, however, that if Plaintiff successfully obtains leave to further amend the Complaint to successfully plead a breach of contract claim under Count II, Plaintiff may be ultimately unable to successfully recover on its promissory estoppel claim. *See Trevino & Assocs. Mech., L.P.*, 400 S.W.3d at 146 (Tex. App. 2013) ("Promissory estoppel is not applicable to a promise covered by a valid contract between the parties."). *But see DeNucci*, 1999 WL 250141, at *8 (allowing the allegation of inconsistent claims of promissory estoppel and breach of contract).

## III.    CONCLUSION

It is therefore **ORDERED** that the Motion, ECF No. 15, is **DENIED** as to Plaintiff's negligent undertaking claim, the breach of contract claim in Count I, and the promissory estoppel claim.

**IT IS FURTHER ORDERED** that the Motion is **GRANTED** as to the remainder of Plaintiff's claims.

**IT IS FURTHER ORDERED** that Plaintiff may, by motion upon a showing of good cause, request leave to further amend the Complaint in a manner consistent with this Order, this

47

Court's Scheduling Order, ECF No. 11, the Federal Rules of Civil Procedure, and all other applicable law.

**IT IS FURTHER ORDERED** that the Initial Motion, ECF No. 2, is **DENIED** as moot.

**SO ORDERED**.

**SIGNED this 19th day of February, 2014.**

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE